UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| YONNA WILLIAMS, | ) |
| Plaintiff, | ) |
| v. | ) CV 00-BU-561-S |
| US AIRWAYS, INC., | ) **ENTERED** |
| Defendant. | ) DEC 21 2000 |

# Memorandum Opinion

In the above-styled action, Plaintiff Yonna Williams brings claims against her employer, Defendant US Airways, Inc., based on allegations that she was subjected to sexual harassment, disparate treatment because of sex, and retaliation for complaining about sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Now before the Court is Defendant's motion for summary judgment, filed November 6, 2000 (Doc. No. 34). Also pending is a motion filed November 27, 2000 by Plaintiff to strike the declarations of Steve Hardegree and Cameron Johnstone, which are included in Defendant's evidentiary submission filed in support of the motion for summary judgment. (Doc. No. 41). The foregoing motions are now ripe for decision. Based on the evidence and arguments presented by the parties, the Court concludes that Plaintiff's motion to strike is due to be DENIED and that Defendants' motion for summary judgment is due to be GRANTED.

## I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties

can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

## II. BACKGROUND[1]

Defendant, a commercial airline, hired Plaintiff in January 1989 to work as a customer service agent at its operation at the Birmingham, Alabama airport. Aside from a furlough in 1991-92, Plaintiff has worked for Defendant in this position until the present. Plaintiff claims that she was subjected to discrimination because of sex, in violation of Title VII, based on allegations that her then-supervisor, Duane Baker, verbally harassed and intimidated her.

The first incident of alleged harassment occurred in May 1993. At that time, Plaintiff was checking in passengers, Baker told her to complete a written survey of how many carry-on bags passengers were bringing on. However, after the flight left, Plaintiff informed Baker that time constraints had prevented her from being able to complete the survey. Baker then "yelled and screamed and screamed at [her]" to "do what I tell you to do when I tell you to do it."

The next incident of alleged harassment Plaintiff can recall occurred almost five years later. On March 18, 1998, Plaintiff was working under Baker's supervision during the closing shift, which ends at 9:00 p.m. Shortly after 8:00 p.m., the official closing time for the ticket counter, Plaintiff was completing a complicated purchase transaction for a passenger who wanted to pre-pay for an international flight ticket. Baker, who had been in the supervisor's office, "stormed out" in front of the passenger and asked Plaintiff in a rude tone why she hadn't closed out her sales report. Plaintiff replied that she would finish processing the passenger's ticket purchase as quickly as she could so she could close out her sales report. After she finished assisting the passenger, Williams left the ticket

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

counter and went to the restroom. Baker paged her and loudly asked her why she had left the counter and told her "that he was having to do things that she was supposed to do." Plaintiff then went to a gate to meet an incoming flight, and she collected the luggage that had not been picked up by the passengers and brought it back up to the ticket counter. Upon her return, Baker again screamed at her, asking "what in the world are you doing," to which Plaintiff replied, "My job." At approximately 8:45 p.m., after Plaintiff completed all her required tasks, she stopped by the supervisor's office, where Baker was on the telephone, to ask if she could leave early. In response, Baker screamed, "You'll leave when I tell you to leave." A few minutes later, Plaintiff returned to the office area to pick up her purse, at which time Baker screamed at her, "If you ever interrupt me while I'm on the phone, I'll take extreme measures with you." Plaintiff then left for the evening.

The next day, Plaintiff complained about the incident to another supervisor, Dave Ogden. He relayed Plaintiff's complaints to his supervisor, Birmingham Station Manager Steve Hardegree, who met with Baker the following Monday, March 23, 1998, to discuss Williams' complaint as well as a number of other complaints recently made against him by employees - - male and female. Hardegree told Baker that numerous agents had complained about his management style, accusing him of yelling, intimidating, and embarrassing employees and displaying outbursts of anger. The next day, Baker distributed a memo to all agents in the Birmingham Station, in which he apologized for his recent behavior and promised that they "will see an immediate change in the way I address and treat the employee group."

Following the March 18, 1998, incident, Plaintiff did everything in her power to avoid Baker. She refused to speak with him and regularly traded shift and work station assignments with other employees to avoid working with him. Indeed, Plaintiff acknowledges that between this incident and January 2000 (when Baker stepped down

from his supervisory position), she worked with Baker only about five or six times. Williams also refused to have any form of oral communication with Baker after the March 18 incident. She admits that Baker would offer ordinary greetings and would sometimes try to initiate normal workplace conversations with her, but she viewed any attempt on his part to speak with her as further harassment. For example, Plaintiff felt that Baker attempted to harass and intimidate her one time when he approached her at her work station at a gate to hand her a paycheck. Similarly, Plaintiff contends that Baker similarly "harassed" her by telephoning her at home on about three occasions to discuss scheduling her for training classes. Plaintiff does not allege that he said anything offensive during these calls, and it is undisputed that Baker was solely responsible for coordinating and scheduling training classes for employees in the Birmingham station at the time. However, Plaintiff viewed the calls themselves as harassing, and she wrote Hardegree a letter dated July 31, 1998, requesting that Baker not be allowed to call her at home for any reason.

Because of Plaintiff's refusal to work or communicate with Baker, Hardegree held a meeting with them in his office on May 15, 1998. At Plaintiff's request, Baker agreed to sign a statement promising that he would not "speak in a harsh or offensive way, look in an offensive way, present a hostile or intimidating work environment" for her or any other employee. Despite this, Plaintiff still refused to work or otherwise interact with Baker.

On September 10, 1998, Baker placed an "Employee Contact Report" in Plaintiff's personnel file, documenting a discussion Baker had with Plaintiff, with Ogden present, concerning her refusal to communicate with him. Baker recounted several incidents where he had spoken to Plaintiff and she refused to acknowledge or answer him. In the report, Baker stated:

> Yonna, I believe you are aware in this business we must

> communicate to survive. I do not ask that you and I become best friends, however, we must be able to have a business relationship. We [Baker and Ogden] will be available to help any way we can. Further more (sic), we will be looking for improvements.

Finally, the report concluded setting forth Plaintiff's "Employee Action/Responsibilities" as follows:

> Employee is responsible to call the supervisor on duty when they are sick.
> Employee is to be responsive to and to interact with supervisor.
> Employee is encouraged to use the Employee Assistance Program.
> If the employee feels she can not (sic) work with supervisor or agents, she may want to consider looking in to (sic) other areas with the company.

The record shows that an Employee Contact Report is a non-disciplinary action designed to formally communicate to an employee that a problem exists and to devise a plan of action to correct the problem. Plaintiff acknowledges that she did not suffer any economic loss or suspension because of the meeting or the report in her file. In addition, although she does not dispute the underlying issue being addressed – i.e., that she refused to communicate with Baker in the workplace, Plaintiff claims that this discussion with Baker was nonetheless harassing and retaliatory.

Plaintiff subsequently discovered in her personnel file another Employee Contact Report that had not been reviewed with her. This second report (incorrectly dated January 1998), documents Plaintiff's continued refusal to communicate with Baker, who had prepared it to be reviewed in January 1999. However, when Baker submitted it to Hardegree for review, he concluded that Baker should not pursue the matter further at this time, given Plaintiff's negative reaction to the previous report from September 1998. Hardegree, however, mistakenly placed the document in her file for safekeeping. Because no follow-up meeting was ever held, it is undisputed that this document should not have remained in Plaintiff's file. Indeed, as soon as Plaintiff brought the second report to Hardegree's attention, he removed it from her file. Plaintiff also considers the issuance

of this second report to be harassing and retaliatory, although she does not dispute that she continued to avoid and refuse to communicate with Baker.

Plaintiff claims that Baker next harassed her on February 4, 1999. On that date, Baker told Plaintiff that her hairstyle was not in compliance with Defendant's policy, although he allegedly did not order another female agent with hair longer than Plaintiff's to change her hair. Plaintiff complied with Baker's order to pull her hair back. Plaintiff acknowledges, however, that shortly after Baker directed her to wear her hair per company policy, he also directed a male agent to put on his jacket, as required by company policy. Plaintiff claims that Baker further harassed her on this date by writing a note on her time card indicating that one of her entries was improper. It is undisputed, though, that Plaintiff went to another supervisor, Dale Demetropoulos, who approved payment for her card as it was, and Plaintiff was paid according to her entry. Finally, Plaintiff claims that while she was helping a customer on that same date, Baker proceeded to stock a ticket counter machine next to her and the door to the machine bumped her on the leg. Plaintiff considers this incident to be further evidence of harassment and retaliation.

The next incident of harassment, according to Plaintiff, occurred on March 25, 1999. Under FAA regulations, some bags are not loaded until after their respective passengers have boarded the flight. In this situation, after the passengers have boarded, agents are to radio the ground crew to communicate any "positive bag match tags" so the appropriate bags can be placed on the aircraft. Because Plaintiff had forgotten her radio, she telephoned another agent to ask him to radio the positive bag match tags to the ground crew. While Plaintiff was on the phone, or immediately thereafter, Baker approached her and, with a raised voice, told her to give him the positive bag match tags. Plaintiff immediately dropped the tags in her hand and left the area.

The next incident Plaintiff perceives as harassing and retaliatory occurred in

September 1999. Plaintiff called in absent on September 23, 1999, in order to take her mother to the hospital. The acting supervisor-on-duty orally approved her request for an emergency personal day off ("PDO"). Because Baker was not aware of this arrangement, he later recorded the day as an "unexcused absence," which are treated differently under company policy. Baker testified that the absence report filled out by the acting supervisor indicated that Plaintiff was taking her mother to the doctor but failed to mention any arrangement to grant her an emergency PDO. Without first speaking to Baker, Plaintiff complained to Demetropoulos, who changed her records to reflect an emergency PDO.

The final incident Plaintiff recalls took place in early January 2000. Plaintiff had neglected to include a $50 ticket transaction in her sales report from the previous evening. As the supervisor on duty the following morning, Baker discovered the discrepancy. When Plaintiff came in to work that day, Baker, with Ogden present, told her that they needed to talk to her. Plaintiff refused to talk with Baker, left the office area and called Ogden out to the counter to ask him, away from Baker, what was wrong with her sales report. Plaintiff recalled that she had inadvertently left the missing sales slip in her work mailbox the night before, and she provided it to Ogden. Plaintiff then announced that she had to leave because she "didn't feel like that the rest of the afternoon [she] could work properly." Plaintiff claims that Baker's attempt to talk with her about the missing sales report was yet another example of harassment and retaliation, because he could have asked one of the other supervisors to handle the situation, instead of speaking with her directly.

On January 4, 2000, Baker stepped down from his position as a supervisor to become a customer service agent. Baker explained that he was "weary" after having been investigated multiple times by Defendant's corporate security, human resources, and the EEOC in connection with Plaintiff's allegations. Baker felt it would be "easier for all concerned," including himself and his family, if he stepped down.

On March 6, 2000, Plaintiff filed this action against Defendant, alleging that Baker "intimidated [and] frightened her" and that "the terms and conditions of her employment have changed in that his unprovoked yelling and controlling nature have caused her to be ill and lose sick and vacation time in an effort to avoid shifts where he is present." Complaint ¶ 10. She also alleged that she "has been given employee/personnel write up by Mr. Baker and told by representatives of the employer that she would simply have to deal with him because he was her supervisor." Id. ¶ 11. In Count One, styled, "Sex Discrimination," Plaintiff claims that Defendant "intentionally discriminated against Plaintiff on the basis of [her] sex, female, in violation of Title VII in that, Plaintiff has been subjected to a hostile work environment." Id. ¶ 13. In Count Two, styled "Hostile Work Environment," Plaintiff asserts, "Defendant condones and allows sex discrimination and harassment." Id. ¶ 17. And finally, in Count Three, styled, "Retaliatory Disciplinary Action," Plaintiff avers, "Defendant has [unlawfully] disciplined Plaintiff in direct retaliation for complaining about the above-referenced violations of Title VII." Id. ¶ 21. Defendant has filed its motion for summary judgment on all claims. Included in the materials filed by Defendant in support of its motion for summary judgment are declarations executed by Cameron Johnstone and Steve Hardegree. Plaintiff has filed a motion to strike theses declarations on the ground that they do not evidence that they were sworn to before a notary public. The Court now turns to consider these pending motions.

### III. CONTENTIONS & ANALYSIS

#### A. Plaintiff's Motion to Strike

In her motion to strike, Plaintiff contends that the declarations executed by Steve Hardegree and Cameron Johnstone, are due to be excluded because they have not been sworn before a notary. However, each affidavit in question contains the statement, "I declare under penalty of perjury that the foregoing is true and correct" immediately above

the declarant's signature. This recitation renders the declarations admissible as evidence on summary judgment pursuant to 28 U.S.C. § 1746,[2] notwithstanding that they were not sworn before a notary. See U.S. v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in State of Ala., 941 F.2d 1428, 1444 n.36 (11th Cir. 1991); Dickinson v. Wainwright, 626 F.2d 1184, 1185-86 (5th Cir. 1980). Plaintiff's motion to strike is without merit.

### B. Defendant's Motion for Summary Judgment

#### 1. Hostile Work Environment

Plaintiff claims that Defendant is liable under Title VII because she was allegedly subjected to harassment that resulted in a hostile work environment. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is well established that a person may recover under Title VII based on harassment directed at him or her because of gender, notwithstanding that

---

[2]28 U.S.C. § 1746 provides, in relevant part:

"Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

". . . .

"(2) If executed within the United States, its territories, possessions, or commonwealths: 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature).' "

harassment does not otherwise result in any economic or tangible job consequences. See Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). However, in order to prevail, Plaintiff has the burden to prove the following at trial: (1) that she belongs to a protected classification; (2) that she has been subjected to unwelcome harassment; (3) that the harassment was because of sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). Defendant contends that it is entitled to summary judgment on this claim because Plaintiff cannot prove the third element, that any harassment to which she was allegedly subjected was because of sex, or the fourth element, that the harassment was severe or pervasive enough to be actionable. The Court agrees.

"Title VII prohibits 'discriminat[ion] . . . because of . . . sex' in the 'terms' or 'conditions' of employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79-80 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)). Thus, "Title VII . . . "is not a 'general civility code.' " Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (quoting Faragher, 524 U.S. at 788). It "does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.' " Oncale, 523 U.S. at 80. "In proving a claim for a hostile work environment due to sexual harassment, therefore, the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment." Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982).

In many cases, a plaintiff demonstrates that harassment is because of sex in that it involves explicit or implicit proposals of sexual activity, which presumably would not have been made to someone of the opposite gender. See id. ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the

supervisor did not treat male employees in a similar fashion. It will therefore be a simple matter for the plaintiff to prove that but for her sex, she would not have been subjected to sexual harassment."). However, in Oncale, a case involving same sex harassment, the Supreme Court explained that there are, of course, other ways in which a plaintiff might show that harassment was "because of sex"':

> [H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A . . . harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.

Oncale, 523 U.S. at 80-81. However, in this circuit, where a supervisor harasses male and female employees in an equally offensive manner, it cannot be said that the supervisor's conduct was motivated by sex or gender. See Henson, 682 F.2d at 904 ("[W]here the conduct complained of is equally offensive to male and female workers . . . the . . . harassment would not be based upon sex because men and women are accorded like treatment").

Plaintiff's allegations here contain no suggestion that Baker pursued her in a sexual manner. Nor has she claimed that Baker made any statements to her or to others indicating an anti-female bias. Plaintiff admits that every employee at the Birmingham station, male and female alike, had "problems" working with and around Baker because they perceived him as being rude and abrasive. Nor does she dispute that numerous employees and passengers of both sexes registered formal and informal complaints about Baker. When asked at her deposition why she believed conduct she considered harassment was gender-based, she repeatedly replied, "It's just the way I feel." Plaintiff states in her affidavit, filed in opposition to Defendant's motion for summary judgment:

> Based on my personal observations of Mr. Duane Baker and his actions towards me I do believe that the fact that I am female made a significant difference in his willingness to harass me and to retaliate against me. The level of severity of the harassment would not have been as great had I been male.

Plaintiff's Aff. at ¶ 5. However, these wholly conclusory assertions, the Court concludes, do not create a genuine issue of material fact in the face of Defendant's properly supported motion. See, e.g., Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value."). The Court concludes that the record shows that a trier of fact could not reasonably find that the alleged harassment of which Plaintiff complains was directed at her because of her sex. Oncale; Henson, supra. Accordingly, summary judgment is warranted on this claim.

The Court also agrees with Defendant that summary judgment is due because the evidence shows that the alleged discriminatory harassment, even if motivated by Plaintiff's gender, falls far short of being severe or pervasive enough to be actionable. In order to prevail, a plaintiff must prove that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). In the Eleventh Circuit's en banc decision in Mendoza, the court explained:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. Harris, 510 U.S. at 21-22 [ ]. The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Id. The environment must be one that 'a reasonable person would find hostile or abusive' and that 'the victim . . . subjectively perceive[s] . . . to be abusive.'

> Id. at 21 [ ]. Furthermore, 'the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." ' Oncale, 118 S.Ct. at 1003 (quoting Harris, 510 U.S. at 23 [ ]).

195 F.3d at 1246.

"The objective standard protects the employer from the 'hypersensitive' employee, but still serves the goal of equal opportunity by removing the walls of discrimination that deprive women of self-respecting employment." Andrews v. City of Philadelphia, 895 F.2d 1469, 1483 (3rd Cir. 1990). In examining whether alleged harassment is sufficiently severe or pervasive to have objectively altered an employee's terms or conditions of employment, four factors are generally considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246. The conduct must be examined in context, not as isolated acts, and the court must determine whether, under the totality of the circumstances, a finder of fact could reasonably conclude that the alleged harassing conduct is objectively sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. See id. The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788.

There is no dispute that Plaintiff herself viewed the conduct as altering the terms and conditions of her employment. Thus, the evidence is sufficient to meet the subjective portion of this element. However, when viewed from a reasonable person perspective, the conduct alleged is not sufficiently severe or pervasive to have created a hostile work environment. In essence, Plaintiff alleges that Baker briefly yelled and screamed at her on two occasions, five years apart, in the context of criticizing Plaintiff's work. Plaintiff may

be correct that Baker was rude, unfair, unprofessional and became angrier than he should have under the circumstances. However, even as Plaintiff describes them, these incidents and the others alleged simply do not, when taken together, even approach an alteration of the terms or conditions of her employment. Plaintiff claims that the May 1993 and March 1998 incidents sent her reeling into a state of perpetual fear, which caused her to view any attempt at communication by Baker towards her as part of a campaign of harassment and intimidation. Her subjective fear, while obviously genuine, cannot be characterized as objectively reasonable. The only thing Baker said that could conceivably be construed as threatening was his vague statement, "If you ever interrupt me on the phone again, I'll take extreme measures with you." Plaintiff appears to have reacted to this as if it were a serious threat to do her bodily harm. However, it cannot be said that a reasonable person would have done so under the circumstances, as Plaintiff does not allege that Baker intentionally touched her, nor does demonstrate how he was otherwise menacing. There is evidence indicating that Baker's conduct interfered with Plaintiff's work performance, as she purportedly so feared Baker that she habitually traded shifts and assignments to avoid working in proximity to him and allegedly suffered health problems requiring medical treatment. However, Plaintiff's subjective feelings and reactions are not the sole measure of whether conduct is of a nature that it unreasonably interferes with job performance; the question is, rather, whether the conduct would have unreasonably interfered with the job performance of an objectively reasonable person in Plaintiff's position. See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000). Given the evidence here, the answer to that question, the Court concludes, must be "no." Finally, Plaintiff acknowledges that she worked with Baker only rarely over the seven year period at issue, if only because of her own efforts at avoidance, precluding any reasonable inference that the harassment alleged was particularly pervasive. In sum, the Court concludes that the evidence here is insufficient to suggest reasonably that the

harassment, when considered in context, created a hostile work environment, under an objective standard. See, e.g., Mendoza; Gupta, supra. Summary judgment is due on Plaintiff's claim that Defendant is liable for gender-based harassment.

### 2. Disparate Treatment

Defendant has also moved for summary judgment with respect to Plaintiff's complaint to the extent it may allege a claim for disparate treatment because of sex, in violation of Title VII. In order to recover on such a claim, Plaintiff would have the burden at trial to show that she was subjected to an adverse employment action. See, e.g., E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.' " Gupta, 212 F.3d at 587 (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3rd Cir. 1997)). The Supreme Court has similarly indicated that an employee may recover under Title VII where her employer, because of a protected characteristic, takes a "tangible employment action," which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Thus, "not everything that makes an employee unhappy is an actionable adverse action" for purposes of federal discrimination law. Doe v. Dekalb County School Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).

In her complaint, Plaintiff appears to claim that Defendant subjected her to disparate treatment because of sex based upon the placement of the Employee Contact Reports in her file, in September 1998 and January 1999. Both of these documents

concerned Plaintiff's admitted avoidance of and refusal to communicate with Baker. However, the Eleventh Circuit Court of Appeals' holding in Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274 (11th Cir. 1999), forecloses the possibility that these memoranda could be considered adverse job action sufficient to support her claim. In Graham, the plaintiff contended that she had been subjected to an adverse job action sufficient to support a Title VII claim based on a memorandum placed in her file expressing concern with her absences from work and warning of possible consequences, along with a classification of some of her absences as unexcused. 193 F.3d at 1283-84. The Court concluded that neither action met the "threshold level of substantiality" required to form the foundation of a suit under Title VII, where the employer had valid reasons for issuing her the memo and the classification, and it was undisputed that the plaintiff did not suffer any repercussions from either action. Id. (quoting Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)). Similarly, in this case, it is clear that Defendant was justified in having concerns about Plaintiff's admitted refusal to work with or even acknowledge communications made by Baker, one of Plaintiff's immediate supervisors, and neither memo had any further consequence on Plaintiff's employment. Therefore, the Court concludes, neither Employee Contact Report can be considered an adverse job action for purposes of a disparate treatment claim. Defendant's motion for summary judgment is due to be granted as it pertains to Plaintiff's disparate treatment claim.

### 3. Retaliation

Finally, Plaintiff claims that Defendant unlawfully "disciplined her in direct retaliation for complaining about [Baker's] violations of Title VII." Complaint ¶ 21. Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

subchapter." 42 U.S.C. § 2000e-3(a)(1). In order to prove a prima facie case of unlawful retaliation, Plaintiff would have the burden to prove at trial the following elements: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) that a causal connection exists between the two. See Gupta, 212 F.3d at 587. Defendant argues that the evidence shows Plaintiff did not suffer an adverse employment action. The Court agrees.

The Court has already explained that Plaintiff did not suffer an adverse job action for purposes of her disparate treatment claim under Title VII. That same analysis also applies here to her retaliation claim. One might assume that a plaintiff might establish an adverse job action sufficient to support a retaliation claim based on proof that she was subjected to harassment motivated by the fact that she engaged in protected activity.[3] Of course, any such claim would still require a plaintiff to show that the harassment was severe or pervasive enough to have altered the terms or conditions of employment, so as to create a hostile work environment. The Court has already concluded, however, that all of the harassment suffered by Plaintiff in this case, whatever its motivation, did not satisfy that requirement. It necessarily follows that the lesser amount of harassment that would have occurred subsequent to any protected activity on Plaintiff's part did not give rise to a hostile work environment, under a reasonable person standard. Accordingly, summary judgment is warranted on Plaintiff's retaliation claim.

---

[3] While the Eleventh Circuit Court of Appeals has not expressly recognized that Title VII protects against a hostile work environment based on retaliation, it has held that Title VII's coverage is not limited to protecting employees only against retaliatory "ultimate employment actions," such as termination or failure to hire. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1455-56 (11th Cir. 1998) (also suggesting that "toleration of harassment by other employees" may be actionable retaliation (quoting Wyatt v. City of Boston, 35 F.3d 13, 15-16 (1st Cir. 1994))). A number of other circuit courts of appeals have held that an employer may be liable for a retaliation-based hostile work environment. See Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 886 (7th Cir. 1998); Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998); Ray v. Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791-92 (6th Cir. 2000).

## IV. CONCLUSION

Based on the foregoing, the Court concludes that Plaintiff's motion to strike (Doc. No. 41) is due to be DENIED and that Defendant's motion for summary judgment (Doc. No. 34) is due to be GRANTED. The Court has determined that the evidence shows that there is no genuine issue of fact and that Defendant is entitled to judgment as a matter of law on each of Plaintiff's claims. Accordingly, this action will be DISMISSED, with prejudice. A separate order will be entered.

DONE this 21st day of December, 2000.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE